Good morning, Your Honors. My name is Mark Mestel. I was trial counsel for Mr. Stockton and I represent him on this appeal. Your Honors, I'd like to discuss two aspects of the assignments of error that we raise in our brief. The first has to do with the search warrant. The second has to do with the sentencing issue. I'd like to basically discuss the search warrant affidavit and in particular paragraph 14 of that affidavit. The case involves the initial wireless entry into a fairly large steel galvanized structure to arrest Mr. Stockton and then the application by Special Agent Cummings to the Magistrate in the Eastern District for a warrant to search the same structure. The paragraph 14 of the search warrant affidavit averses that the agent conducting the thermal imagery actually saw the smugglers who entered the United States crossing the United States-Canadian border enter into the warehouse and a short while later or are seen leaving from the warehouse. It was that agent's opinion that they had been carrying large packs on their back based on their training and experience. They believed that they were probably smuggling drugs into the United States. The Magistrate, no doubt having read the affidavit, believed that they came into the United States with these large backpacks. They went into a building. Counsel, let's take that out. What's left in the affidavit that wouldn't support probable cause? Well, Your Honor, I don't believe there's sufficient facts left. What we have are observations of foot tracks going up to the door, going from the backpacks, which are found 75 to 100 yards north of the structure, going to the door and an earlier sighting that there had been some activity concerning the United States-Canadian border at which four people were backtracked, once again, going back to this structure. But he saw people. There's no doubt that they saw individuals. The question is, did they see him going into the structure, correct? That's correct, Your Honor. So they saw him in the vicinity of the structure. Is that fair to say? Absolutely, Your Honor. And the footprints lead to the structure from the backpack area? That's correct, Your Honor. And it's near the Canadian border? It is within, I think, two miles of the border. And they've had a bunch of drug activity up there? I assume they have, Your Honor. So I crossed out all the things in the affidavit that seemed shaky or implicated the curtilage, and it would seem that under the test for issuing a warrant that you would have certainly enough of the kind of suspicion necessary to go after a warrant for the galvanized structure. I mean, I guess I'm having some problem as to why these things kind of pull the rug out from under the affidavit. Well, Your Honor, if we start off with the fact that we're at this point limited to the four corners of the affidavit. Right. We have somebody basically on a hilltop using a thermal imager to look at something that's approximately a mile and a half away. We have the people disappearing behind the structure. We have really no idea as to the scope of view of the observer at this point. That is, how does the building obstruct what's happening behind the building? We know that the backpacks are found basically a football distance away from the structure. Is it more than speculation that they went into the structure and they simply didn't disappear behind the structure for a period and abandoned their marijuana to another confederate in the woods, leave their backpacks in the woods? I think that there needs to be a nexus between the inside of the structure and the smugglers. And I just don't think it's there. I mean, it just seems, if you go to fair, I don't think you could say that they necessarily went in there. But the question isn't, did they really go in there, isn't it? Isn't there a probability or some substantial chance that the people went into that structure? But what is there really in the record to suggest that they went into the structure other than they're arrested without the suspected contraband? So in other words, you think that you would need evidence of them in the structure? I think you would need some evidence, whether it was a light coming on a door open, something to indicate that the structure was more than a obstacle behind which they disappeared. Well, counsel, isn't there evidence that they, that there was a dragging, which looked like the packs had been pulled along to the door? There was some testimony, there was something in the affidavit, Your Honor. I believe that there was, you know, I have to profess, Your Honor, that I don't remember whether it's in the search warrant affidavit or if it was introduced as evidence during the suppression hearing. But certainly, if we start off with the fact that it is curtilage, and if you'll notice in paragraph 12 of the affidavit, they describe this as his residence, and it's the middle of the night, and now they're searching up to the doorway of his residence, which I would contend is his curtilage. If we remove that, then don't we also remove the tracks that the backpacks may have made if they were to short-circuit the affidavit, because that's obviously important. But I am pretty interested in the sentencing issue. Your Honor, sentencing has taken on a whole new approach since the Booker decision. We have a gentleman in this case who attempted suicide on the eve of the first scheduled trial. Subsequently, was placed in a psychiatric hospital, then transferred back to the Bureau of Prisons where he underwent a competency evaluation. Let me ask this. Part of the sentencing transcript that's in the excerpts of record isn't complete. Now, what did the judge do about this psychiatric report? Was it offered and he wouldn't take it? What happened? No, it was offered as part of the defense sentencing memorandum. I assume, knowing Judge did a small part that goes to what he said, considering the fact that it's under 3553, the government included his entire oral pronouncement at sentencing. It's never mentioned. They talk about my client's age. They talk about his inability to pay a fine. They talk about his lying in the suppression hearing for a two-point upward adjustment. But the material submitted that was authored by Dr. Mays is never mentioned. What was argued? I know it's in the sentencing memorandum. What was argued orally to the judge about the psychology report, other than the fact that it was appended? I don't remember, Your Honor. I really just don't remember. I know that our argument basically was through our pleadings and to the point of the case. I mean, I guess here's my impression, and maybe this is where we're sort of like this, is that it's in there, and, you know, you presume he read it, but he didn't comment on it. It's a major part. But I was wondering whether it really also was a major part of what the defense put on for him, in terms of the argument. So I'm wondering if, you know, that the judge could have overlooked it because there hadn't been real emphasis placed on it. Your Honor, I think we put as much emphasis on it as we could in our pleading. Frankly, at the time of sentencing, I was more concerned with what effect the guideline calculation would have on the judge's ultimate sentence, and was trying to avoid as high a base offense level with adjustments as possible, which is why we were arguing that just because the marijuana was left essentially in his possession as a warehouseman did not make him an organizer, leader, or manager. Well, what about the fact that he went to Canada on three occasions, I guess? He must have been going for a purpose, which thinks he's little more than just a warehouseman. Your Honor, I would agree with that, but for the fact that on the aborted attempt to deliver marijuana across the border, where he is seen coming across the border, the Confederates are saying, we're not going in, there's a surveillance car by the border. He's saying, I'll take the marijuana and bring it in, and they don't give it to him. So if he really was in a position, a supervisory position, that should not have happened. He should have been able to control what was happening with the marijuana and should have been able to take in a pack. I think that detracts from the inferences, because there's certainly no direct evidence as to what he's doing in Canada on any of these occasions. He meets with Mr. Trudeau, but there's really no evidence. It's this unknown individual named Chad who seems to be the organizer of the smugglers. But isn't it sufficient that he managed, took care, took the responsibility for holding the marijuana in his house? Your Honor, did not... As required under the guideline. Did not each of the Canadians take responsibility for the marijuana that they carried? I mean, is there a significant difference? They delivered it to his shed, and so he took charge of the property. Right. Doesn't that fall within the guideline description? I think if you could show that he had managerial responsibility as opposed to watching it. Somebody turned it over to the Canadians. They had it. They carried it. They exercised the same managerial responsibility over the marijuana as the person who next took it from them. There is no evidence as to what was going to happen via the Mr. Stockton and that marijuana after it was left at the residence. My red light has gone off. Let me just ask you, because we're in a kind of another world on sentencing as well, awaiting some more issues by the Supreme Court. If it's attached to your memorandum, and I'm now looking at this full sentencing transcript, and you mentioned that there were factors in his emotional makeup that are relevant to a determination of a just and appropriate sentence, and I think you mentioned in your oral statement about suicide. We have cases that say that the district judge doesn't need to kind of click through and explain every factor, but it's a little troublesome here because the mental health report is a significant one. How would you frame the principle that you're proposing in terms of what the district judge can do to discharge his consideration requirement? Well, Your Honor, perhaps a checklist would be valuable and would create a... We already rejected that in a lot of cases.    Your Honor, I think when the mainstay of a presentation includes reports by experts, that at a minimum the court should explain why that does or does not affect his determination of the reasonableness of the sentence. Obviously, Judge Whaley knew that this was a troubled man because we didn't start trial as scheduled because Mr. Stockton was now in a psychiatric phrase of 3553 is the history and characteristics of the defendant, I think makes it impossible for you to review the reasonableness of a sentence. So I think that perhaps not every single issue or factor submitted by the defense needs to be addressed, but there needs to be some overview of the material presented and have the court say why it is or isn't relevant to a reasonableness determination. But what troubles me about that argument is reading the sentencing transcript. You didn't do it for the judge. That is, you made no presentation as to why that report is relevant to sentencing. You just referred to it and then dropped the subject. Your Honor, I did it through my pleadings, and having appeared before Judge Whaley, I was certain that he had read the pleadings. Well, I'm sure you later put over the pre-sentence report, which dealt with the same subject. The pre-sentence report did not really address my client's psychiatric condition, other than the fact that he attempted suicide. That's why we retained Dr. Mays to provide supplemental information. Thank you, Your Honor. Thank you. We took a little extra time, and so if you need some extra time, we'll give the same to you, Mr. Harrington. Thank you. Again, for the record, my name is Joe Harrington. Welcome back. Thank you. Assistant U.S. Attorney in Spokane, Washington. Your Honor, just out of a bounce of caution, I want to advise the Court that in this case, the Border Patrol agents weren't using a thermal imaging device. This was a night vision scope, which allowed them to look at, I guess, figures and animals and people at night, but it wasn't involving any kind of thermal. It's not the Kylo case. Correct, Your Honor. I want to make sure that's understood. The other thing is that Mr. Stockton's shed is not four miles from the Canadian border. It's approximately a mile and a half. It's right very near the Canadian border over in northeastern Washington State. With respect to the affidavit in support of the search warrant, it is in the supplemental lexer for the records at pages 33 through 35. And I would note that paragraph 16 of that affidavit does indicate that there were foot impressions or traffic visible on the ground from the area of the backpack frames to the galvanized steel structure. So that, in addition to the proximity to the Canadian border, as well as the other smuggler's trail with what appeared to be backpacks and then seeing people dart away from the area of the steel structure. And ultimately, those individuals, five of the individuals were arrested, all of whom were Canadian citizens. Were those footprints within what he calls the curtilage? I'm sorry, Your Honor? Were those footprints within the curtilage? Well, the curtilage is, I guess that's a whole other separate issue. I'm just raising the question whether the affidavit relies on evidence that was improperly obtained. I guess you could look at the curtilage. It comes up in two instances. The first instance is what happened about three weeks prior to this arrest, and that's when officers were also surveilling the smuggler's trail. This is kind of a simple question he asked you. Were the footprints within the curtilage? The foot impression in the traffic or the drag marks that evening from the backpack frames was not within the curtilage because it's the government's position, at least, that there wasn't any curtilage. Well, assume there was curtilage. Would they have been within the curtilage? The foot impression in the traffic came from the backpack frames, and those were found somewhere between 75 and 100 yards from the steel structure. That's the backpacks? The backpack. They would be outside the curtilage, presumably. Yes, Your Honor. But the footprints and the drag marks led up to the shed, did they not? They did, Your Honor. So at some point, they became part of the curtilage or they entered the curtilage. Assuming there's curtilage. Well, assuming it, right? Yes, Your Honor. But if there was a curtilage and if they did occur in the curtilage, then we have a problem over whether the affidavit could properly rely on that evidence. And, Your Honor, I don't think that presents a significant problem because even if you excise that information out of the affidavit, you're still left with the information that the Border Patrol agents were at a location. They were surveilling this trail for a reason that night. It was because it was a heavily traveled cross-border trail from the United States into Canada. There's another question. Could those footprints have been seen from outside the curtilage? There's nothing in the affidavit to support that conclusion. I would submit, Your Honor, it would have been, but there's nothing in the record that could support that, I think, that information. Well, they're continuous footprints, right? Right. So if you had a footprint here and then you walked up to wherever the curtilage might be. It's a magic line. That's a magic electronic line. Presumably one could look over some distance. Yes. So at some point, I guess you're right, the curtilage has some, there's some area where the curtilage is. There's got to be some area. Yes. They call it his house or his home. How about the dog pointing to the backpack? Was that? That evening also there was a drug god came and alerted on the backpack frames to the presence of marijuana. Now, remember, these backpack frames are empty backpack frames. They're bound with some bungee cords kind of out there outside the structure. Eventually what happens is that when the search warrant is executed, the seven full backpack frames loaded with over 300 kilograms of marijuana are found inside the structure. And evidence at trial indicated that the empty backpack frames were placed out there for the return trip back up to Canada, kind of doing the full circuit. I'd like to hear before you run out of time what you have to say about the 3553 issue. Your Honor, the courts now in the wake of Booker have to, first of all, accurately calculate the sentencing guideline range. It's the government's position the court did that in this case and then took that into consideration when imposing the sentence. Judge Whaley, I think, did a good job at sentencing and actually didn't go through a checklist, which I don't think he's required to do under 3553. But he did look at the factors, didn't express each one of them individually, but looked at them individually. Okay. Here's what he said. I mean, most of the discussion is about this leader-organizer business. That's right. And he gets to the end of that, and then he says there's a few things the government wants me to do to increase the sentence. And he's young, and I'm not going to do that. But then he just says, based on consideration of all those matters that are under 3553A, it seems to me the guideline sentence of 97 months at the low end is appropriate. So it seemed to me the only place we knew that – I mean, that's a kind of a bold recitation of I considered all the factors, period. Doesn't he have to do a little bit more than that? I mean, I mean, he's a very careful person, and, you know, obviously the big issue was the two- or three-point enhancement. But the psychiatric report is pretty significant, and we just have no idea what he did or didn't consider. I understand, Your Honor. The – there was some pre-sentencing briefing by Mr. Mistel, good counsel for the defendant and by the government. That issue was raised and materials were submitted. The PSR was also – at least had some information about the defendant's prior – In the PSR, there's a lot of information about his mental problems. But this report says that the other stuff was not really clear about the fact of his It's a significant report, and it is – goes quite a bit farther than the PSR. So it's a little bit troubling to think that Judge Whaley didn't think that was important enough to comment on it. I think we all respect Judge Whaley. Yes. He may not have specifically commented on it. I would submit respectfully that he considered the full record. Well, is it the government's position that you have a sentencing memorandum, you have PSR, that all the district judge has to do is say, based on consideration of all of this and the factors under 3553, I sentence to X? Is that all you have to do? That may be all that a district court has to do, particularly given the context of what the arguments were that were sort of teed up at the sentencing hearing. And that really raises the question is, if it's in the sentencing memorandum in a clear way, is there any obligation of defense counsel to hit the judge over the head with it? Well, I think if it's an issue for the defense, I think it has to be addressed at sentencing, or at least ask the court to make some findings if it's important for the defense. I guess it – I think it could put a district court in a difficult position to have to specifically address each and every factor under 3553. Well, we're not saying that. No. We're just saying this is an important one. Yes. What about this increase for his being a leader or a manager? The judge made the comment that it wasn't clear that he was supervising anybody. It's interesting. I think that there are some facts that are important to note. One is that all this marijuana that came in from Canada was worth millions, was left at Mr. Stockton's shed in his complete control and custody. Is that enough? Well, that may not be enough, but that's not all the facts. Could it be enough? I think it – in some respects, I think it could be. I think that that much marijuana, it's not just a single load, but it's seven backpacks full. It took seven people to trek that across the Canadian border. That's a lot of money and a lot of responsibility for an organization to place into one person's complete and isolated control. But more than that, Mr. Stockton, it was either usually the day before or two days before, would make trips to Canada, and the RCMP was actually involved surveilling him. And observed him meeting with one of the other charged co-conspirators, Joseph Trudeau. Meetings are held. Mr. Stockton then races back, and, of course, then either that next night or the following day, another load of marijuana comes through. I think that there was reasonable inferences that could be drawn that he was actually, by going to Canada, meeting with co-conspirators and arranging things, that it placed him in a different position than just a simple one of the participants in the organization. Thank you. Thank you for your time. United States v. Stockton is submitted. And I thank both counsel for your argument this morning.
judges: B. Fletcher, McKeown, Schwarzer